BARRY A. CHATZ  SB# 140638
KEVIN H. MORSE SB# 253066
**SAUL EWING ARNSTEIN & LEHR LLP**
161 N. Clark Street, Suite 4200
Chicago, IL 60601
Tel: 312-876-7100
Fax: 312-876-0288
E-Mail: barry.chatz@saul.com
          kevin.morse@saul.com

- and –

**LEWIS BRISBOIS BISGAARD & SMITH** LLP
AMY L. GOLDMAN, SB# 134088
    E-Mail: Amy.Goldman@lewisbrisbois.com
LOVEE D. SARENAS, SB# 204361
    E-Mail: Lovee.Sarenas@lewisbrisbois.com
633 W. 5th Street, Suite 4000
Los Angeles, California 90071
Tel:  213-250.1800
Fax: 213-250.7900

[Proposed] Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>ECLIPSE BERRY FARMS, LLC, *et al.*[1]<br><br>Debtors. | Case No.: 2:18-bk-10443 BR<br><br>Chapter 11<br><br>**DECLARATION OF ROBERT MARCUS, CHIEF RESTRUCTURING OFFICER IN SUPPORT OF FIRST DAY MOTIONS** |

I, Robert Marcus, declare as follows:

1.      I am over eighteen years of age.  I am the Chief Restructuring Officer of Eclipse

Berry Farms, LLC, and its wholly owned subsidiaries, Harvest Moon Strawberry Farms, LLC

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Eclipse Berry Farms, LLC (5837), Rosalyn Farms, LLC (8986), and Harvest Moon Strawberry Farms, LLC (4328).

and Rosalyn Farms, LLC, each a debtor and debtor-in-possession in the above-captioned cases (collectively, the "Debtors"). I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' downsizing and liquidation efforts.

2.       On January 16, 2018 (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to maximize the value of their Chapter 11 estates through an orderly liquidation of the estates' remaining assets (the "Chapter 11 Cases").

3.       The Debtors intend to maintain control of their businesses and to manage their financial affairs as debtors in possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

4.       The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Motions") in order to minimize potential adverse effects of the bankruptcy filings and to maximize the value of their estates. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of the Debtors' voluntary petitions and First Day Motions.

5.       Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with members of the Debtors' management team and Debtors' other personnel and professionals, my knowledge and review of relevant documents including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

6.       I am familiar with the contents of each First Day Motion, including each exhibit, and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each of the First Day Motions will provide an orderly transition of the Debtors into these Chapter 11 Cases and ultimately permit the Debtors to maximize recoveries for all parties in interest. Further, I believe the relief sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and stakeholders.

7.    I respectfully submit this Declaration in connection with and in support of the following First Day Motions: (i) *Motion for Joint Administration of Debtors' Bankruptcy Cases;* (ii) *Motion for Use of Cash Collateral;* (iii) *Motion for Order Authorizing, but not directing, the Debtors to Pay Certain Accrued Prepetition Health Care Insurance Premiums;* (iv) *Motion for Order Authorizing, but not directing, the Debtors to Pay Key Employee Severance Payments and Contractual Severance Payments;* (v) *Motion for Order Establishing Procedures for the Assertion of PACA Claims and Related Relief; and* (vi) *Motion for Interim and Final Order Pursuant to Section 366 of the Bankruptcy Code Determining Adequate Assurance of Payment for Postpetition Utility Services.*

**A.    Overview of the Debtors' Businesses and History**

8.    In 1963, Norman Gilfenbain ("Gilfenbain") launched a Los Angeles-based produce company doing business as Cal-Fruit. Cal-Fruit was dissolved in the 1990s but Gilfenbain retained the rights to pack fruit under the "Cal-Fruit" label.

9.    On September 20, 1999, Gilfenbain, along with Robert Wiviott ("Wiviott"), formed the debtor Eclipse Berry Farms, LLC ("EBF"). The original members of EBF were Gilfenbain and Ventura Strawberry Farms, Inc. ("Ventura"), a California corporation controlled by Wiviott. Gilfenbain and Ventura each owned equal 50% membership interests in EBF, and Gilfenbain and Wiviott served as co-managers of EBF.

10.    At its origins, EBF began with a 240 acre farming operation in Oxnard, California. Over time, EBF expanded its farming operations into Salinas, California (Monterey County) and Santa Maria, California (Santa Barbara County). At its peak, EBF had a 2,500+ acre farming operation and more than 3,000 employees working in offices and on farmland across its various leased farms and offices in Northern and Southern California. EBF did not own any of the real property on which it operated its farms or its offices.

11.    EBF's core operation was farming strawberries and its expanded operations into Salinas and Santa Maria allowed it to offer an extended growing season over many of its competitors. EBF's customer base included retailers (such as Walmart, H-E-B Grocery, and Kroger), brokers/wholesalers (such as C&S Wholesale Produce, Westlake Fresh, and Blazer Wilkenson), and processors (such as Sunrise Growers, Tree Top, and Island Oasis). In order to

provide its extensive customer base with year-round strawberries, EBF entered into supply agreements with strawberry growers in California, Florida, and Mexico.

12.    In 2006, Gilfenbain transferred his membership interest in EBF to the Gilfenbain Family Trust dated May 15, 1990. In 2013, Gilfenbain passed away, and the current trustees of the Gilfenbain Family Trust are his widow Gloria Gilfenbain and third-party Gary Finkel.

13.    In early 2014, Wiviott brought in Rodolfo Garza ("Garza") from SunOpta, a publicly traded multi-national food and mineral company, as the Chief Financial Officer.

14.    On February 5, 2016, EBF, as the sole member, and Wiviott, as the manager, formed debtor Rosalyn Farms, LLC ("Rosalyn"). Rosalyn was formed solely as a pass-through entity for the employment and payroll of EBF's employees located in Santa Maria, California.

15.    By early 2016, Wiviott's health began to seriously decline. On June 26, 2016, Garza assumed the roles of President and Chief Financial Officer of EBF, and Wiviott retained his position as Chairman of EBF. That same day, pursuant to EBF's operating agreement, Wiviott appointed Garza as manager of EBF.

16.    On January 14, 2017, Wiviott passed away and, shortly thereafter, the Debtors undertook a process to attempt to sell its businesses as a going concern.

17.    On January 27, 2017, EBF, as the sole member, and Garza, as the manager, formed debtor Harvest Moon Strawberry Farms, LLC ("Harvest Moon"). Harvest Moon was formed solely as a pass-through entity for the employment and payroll of EBF's employees located in Salinas, California.

18.    As recently as 2016, EBF was one of the largest fresh strawberry shippers in the country with gross revenues of approximately $230,000,000 in 2016.

**B.    Sale Process, Settlements, and Liquidation of Debtors' Assets**

    **i.    The Sale Process**

19.    On March 22, 2017, the Debtors retained Murray Wise Capital, LLC ("MWC") to provide financial advisory services to EBF for the sale of its strawberry growing, packing, and marketing businesses as a going-concern. By mid-May 2017, MWC went to market for the sale of the Debtors, issuing between 25-30 non-disclosure agreements to potential purchasers,

and eventually receiving seven (7) non-binding indications of interest prior to the July 2017 deadline.

20.    In late-July 2017, Wells Fargo Bank, N.A. ("Wells Fargo") informed the Debtors that Wells Fargo would no longer renew its long-standing $49 million lines of credit that were essential to Debtors' operations.  These lines of credit were pass-through lines of credit with Wells Fargo and Ventura in the aggregate available amount of $49 million, and were secured by the Debtors' assets.  Traditionally, the growing season in California began in August of the preceding year with the season ending in July through November of the following year. Financing for farming operations followed the traditional growing season.  Like most farms, EBF would draw on its line of credit at the beginning of the growing season (August), when overhead and capital were required to plant the new crops, and pay off the outstanding line by the end of the growing season (following year).

21.    Wells Fargo's withdrawal of EBF's lines of credit created difficult constraints on the sale of EBF.  Shortly after Wells Fargo pulled the lines of credit, EBF also received the financial results from its production for the first half of 2017.  The first half of 2017 was difficult for the strawberry industry as a whole as well as the Debtors based on, among other factors, poor market conditions, overproduction of berries, including foreign farmers, and less than stellar crops from the La Niña conditions persistent throughout California.  EBF's financials showed a loss between $5-6 million for the first half of 2017.  As a result of its loss of financing and poor financial results, all legitimate indications of interest were no longer feasible as submitted for the purchase of the Debtors' assets as a going concern.  Debtors sought revised offers based on the material change of circumstances.

ii.    **The Settlements and Liquidation of Debtors' Assets**

22.    On September 6, 2017, with the consent of the respective managers and members, the Debtors appointed Robert Marcus, Esq. of Maksimovich & Associates, P.C. as Chief Restructuring Officer to, *inter alia*, evaluate company operations and implement procedures to maximize the recovery for all legally interested parties (the "CRO").

23.    Immediately upon his appointment, the CRO focused his attention on (1) the evaluation and feasibility of any revised offers based on the material change of circumstances;

(2) completing the 2017 harvest, marketing, and sale of crops; (3) continuing processing operations and sale of processing inventory; (4) reviewing and continuing EBF's Mexico-grown berry operations; and (5) finding growers to assume the leases and reimburse crop expenses for the 2018 crop. The CRO retained all employees as required to carry-out these urgent concerns and maximize the value and monetize these assets. EBF completed the 2017 crop harvest by mid-November in Santa Maria and late November in Salinas. All processing was completed by the end of November, with inventory remaining to be sold in cold storage. The Mexico-grown berry operations ceased imports in Mid-December.

24.    As of September 6, 2017, EBF had already undertaken substantial efforts toward its 2018 crop season. EBF planned 1,535 acres for the 2018 crop. By September 2017, EBF had made substantial progress in preparing its land for the 2018 crop with approximately 99% completion for Oxnard, approximately 90% completion for Santa Maria, and approximately 30% completed for Salinas. In total, it is estimated EBF invested $10 million in preparation for the 2018 crop season. The 2018 crop season expenditure was necessary given the narrow windows available for preparation and planting as well as preserving a potential going concern sale. This expediency required the CRO to take immediate action to preserve the value of these critical investments. Shortly after his appointment, with the assistance of MWC, the CRO identified and began negotiations with Robert "Bobby" Jones of West Coast Berry Farms, LLC and his subsequently organized affiliate Superior Fruit LLC (collectively, "Superior") for the assumption of certain agricultural leases, crop expense reimbursement, and other potential asset purchases.

25.    By September 25, 2017, the CRO had agreed to terms with Superior for assumption of a majority of EBF's leases, significant reimbursement of expenses, and a $5.5 million payment made prior to the Petition Date. As part of the deal, Superior agreed to assume a majority of EBF's leases, thereby eliminating more than $13.45 million in outstanding lease obligations. The CRO has obtained full releases from most of the respective landlords. Superior also agreed to pay for or assume EBF's 2018 crop expenditures related to the Superior assumed leases. Pursuant to the terms of the agreement, to date, Superior has defaulted on more than $1.75 million in outstanding payments for equipment purchases, packaging, IP rights to the

"Cal-Fruit Since 1963" trademark. Additionally, Superior owes the estates reimbursement or proof of assumption of 2018 crop expense of an additional $3.2 million.[2]

26.    EBF remains in possession of its Los Angeles headquarters lease and its Oxnard yard lease.[3] The remaining unexpired agricultural leases not assumed by Superior were either turned over or taken over by their respective landlords. The CRO has obtained, when available, full release of liability for the estates from the assumption of these leases.

27.    On December 15, 2018, the CRO also oversaw an auction conducted by Weeks Auction Co., LLC of all excess farming equipment, which net approximately $3 million for distribution to the estate's creditors (including those holding claims secured by the equipment).

28.    Overall, from September 6, 2017 through the end of 2017, EBF has had gross deposits in excess of $45 million from completion of the 2017 crop season harvest, processing, wind-up of Mexico, recovery of receivables, and reimbursement for 2018 crop expenses. After payment of necessary expenses, including operational and downsizing costs, the post-September 2017 activities that, to date, have resulted in net benefits to the Debtors of more than $12,000,000+ cash on hand and $13,000,000+ in relieved liabilities for the estates.

29.    EBF has a significant creditor body consisting of both secured and unsecured claims in excess of $50 million. The CRO has undertaken to engage in claims negotiation with these most significant creditors, and others, in order to maximize returns and make funds available for all parties in interest. Many of these creditors have entered into discussions and settlements allowing the CRO to maximize the return for all creditors. Other creditors have sought recovery through the legal system. As of the Petition Date, there are currently five (5) lawsuits pending against EBF for a variety of collection actions, along with a few administrative actions.

---

[2] The CRO and Superior were attempting to complete the transaction contemplated between EBF and Superior just prior to the Petition Date. However, due to Robert Mann Packaging, Inc.'s conduct, the Debtors were forced to file for relief before the transaction could be completed. EBF intends to shortly file a motion to authorize the completion of the transaction with Superior.

[3] EBF has retained its contractual rights to its Oxnard yard to secure and maintain EBF's rights, title, and interest to all personal property at such location.

30. The estates also hold significant causes of action against third parties, including, without limitation, PACA claims against customers, insurance recovery claims, and other claims. EBF intends to file adversary proceedings for many, if not most, of these claims on or shortly after the Petition Date.

31. On January 15, 2018, Robert Mann Packaging, Inc., one of the Debtors' largest unsecured creditors, informed the CRO that it would file an action against the Debtors, upon information and belief, for injunctive relief, which would cause significant harm to the Debtors' ongoing efforts to maximize recovery for all creditors.

32. The Debtors filed these cases to finalize the orderly liquidation of their estates, wind-up their affairs, and adjudicate all outstanding claims in a single forum to ensure that creditors, on all levels, are treated fairly and equitably.

## C.   First Day Motions

### i.   Joint Administration of Chapter 11 Cases

33. EBF is the sole member of Harvest Moon and Rosalyn. These subsidiary entities have assets that given the flow-through nature of the relationship between EBF and its subsidiaries, all of which will inure to the benefit of EBF. Debtors believe that joint administration of these cases will save the Debtors and their estates substantial time and expense because it will remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee and other parties in interest will similarly benefit from joint administration of these chapter 11 cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

34. The Debtors propose that the joint administration of the estates be implemented as follows:

a. <u>Pleadings</u>. The use of a single docket for the Chapter 11 cases, and for filing, lodging and docketing the pleadings, orders and all other papers (including notices of hearing in any of the cases) under the Eclipse Berry Farms, LLC caption and case number of 18-10443-BR, and in the form as attached hereto as <u>Exhibit i-A</u>. Each pleading shall indicate which of the Debtors is party to or affected by the subject filing.

b.    <u>Proofs of Claim</u>. Because the Debtors are separate entities and there has been no substantive consolidation of the estates, proofs of claim should be captioned for the particular Debtor against which the claim is asserted. Further, the Clerk should maintain separate claims registers for each estate.

c.    <u>United States Trustee's Reporting Requirements</u>. All reports and statements filed with the Office of the United States Trustee shall be filed and maintained separately for each Debtor.

d.    <u>Schedules of Assets and Liabilities and Statement of Financial Affairs</u>. Each Debtor shall file its own Schedules of Assets and Liabilities and a Statement of Financial Affairs on its respective docket.

e.    <u>Notice to Creditors of Entry of Order</u>. After entry of the Order approving the joint administration, the Debtors shall transmit to all known creditors of each estate a notice setting forth the pertinent information with respect to the joint administration (which notice may be combined with other notices to creditors)

35.    Joint administration will not adversely affect creditors' rights because Debtors seek only the administrative consolidation of the estates, and do not seek substantive consolidation. As such, each creditor will continue to hold its claim against a particular Debtors' estate. Based on the foregoing, joint administration is necessary and appropriate, and is in the best interests of the Debtors' estates and creditors.

**ii.    Use of Cash Collateral**

36.    The Debtors have concurrently filed a motion for authorization to (a) use the cash collateral (as defined in section 363(a) of the Bankruptcy Code) in which Ventura may hold an interest (the "<u>Cash Collateral</u>"); and (b) provide and grant replacement liens to Ventura (the "<u>Cash Collateral Motion</u>")

/ / /

/ / /

/ / /

/ / /

### Purposes for Use of Cash Collateral

37.    The Debtors require the use of Cash Collateral to pay for: (a) the costs of the orderly liquidation of their business, and (b) the costs of administration of the Debtors' chapter 11 cases, including the payment of the CRO's compensation, Debtors' professional fees, and U.S. Trustee's fees.    The Debtors also desire to use Cash Collateral to pay for pre-petition insurance premiums, employee wages, and other necessary expenditures for the administration of the bankruptcy estates as set forth more fully in the Debtors' proposed budget ("Budget") attached to the Marcus Declaration as Exhibit ii-A.

### Material Terms Regarding Use of Cash Collateral

The material terms and provisions of the Debtors' proposed use of Cash Collateral are:

a.    Use of Cash Collateral.    The Debtors shall use Cash Collateral in accordance with the Budget attached to the Marcus Declaration as Exhibit ii-A.    Prior to the final hearing on the Cash Collateral Motion, the Debtors shall submit a Supplemental Budget for further time periods as needed.    Additionally, the parties have agreed and consented, pursuant to Section 363(c)(2) of the Bankruptcy Code, to allow Debtors use of their cash collateral from the Petition Date through the preliminary hearing date on this Motion.

b.    Deposits of Cash Collateral.    Debtors shall deposit all Cash Collateral into the debtor in possession accounts opened at JPMorgan Chase Bank (collectively, the "Cash Collateral Accounts"), in accordance with the U.S. Trustee Guidelines and Requirements for Chapter 11 Debtors in Possession promptly upon receipt thereof.[4]

c.    Budget.    The Debtors have prepared a Budget which sets forth the required uses of Cash Collateral through April 15, 2018.    A copy of the Budget is attached to the Marcus Declaration as Exhibit ii-A. The Debtors intend to submit modified or supplemental

---

[4] The Debtors are seeking authority to maintain certain prepetition payroll accounts for the payment of wages, and related expenses, with respect to prepetition wages of Debtors' previous employees. All Cash Collateral, except that remaining in the prepetition payroll accounts, have been deposited into the Cash Collateral Accounts.  The amounts remaining in the Rosalyn Farms and Harvest Moons Strawberry Farms payroll accounts are not included in the Budget but will be accounted for and detailed in the respective Debtors' monthly operating report.

Budgets for periods beyond April 15, 2018 at later dates as agreed upon by the parties. Notwithstanding the amount of cash collateral existing in any of the Debtors' accounts, Debtors will be allowed to expend cash and funds to pay those charges and expenses set forth in the attached Budget, with an agreed variance of up to 10% for each line-item.

d.    _Adequate Protection_.  In  order to provide Ventura with adequate protection for the Debtors' use of their cash collateral, the Debtors will grant the following:

i.    _Replacement Liens_.  Pursuant to § 361 of the Bankruptcy Code, Ventura shall be granted replacement liens (the "Replacement Liens") in the Debtors' existing and after-acquired assets post-petition to the extent of the Debtors' use of their cash collateral.  The Replacement Liens shall be of the same extent, scope, validity and priority as the pre-petition liens of Ventura.[5].

### Pre-Petition Loans

38.    On July 11, 2017, to meet current obligations owed to Wells Fargo, Ventura advanced $4.3 million to EBF, memorialized through a promissory note dated the same date. On August 2, 2017, Ventura advanced an additional $17.3 million to EBF, through an amended promissory note, enough to satisfy the full amount of the Wells Fargo line of credit and caused Wells Fargo to release all of its liens against Debtors' assets.  The obligations under the amended promissory note were purportedly secured through a Security Agreement dated August 2, 2017, granting Ventura liens on all of Debtors' assets, including cash.  A copy of the relevant Ventura loan documents is attached as Exhibit ii-B.  Ventura asserts that EBF's outstanding debt totals more than $29.6 million, consisting of the $21.6 million advanced in July and August 2017 ("Secured Claim"), and $8 million in unsecured advances made prior to July 2017 ("Unsecured Claim").  On September 1, 2017, Ventura filed a UCC-1 financing statement purportedly securing the $21.6 million July and August advances against all of EBF's assets.  A copy of the Ventura UCC-1 financing statement is attached as Exhibit ii-C.

---

[5] The Debtors have entered into discussions with Ventura on the extent and amount of Ventura's liens, if any, against its assets. EBF and Ventura have agreed to the use of cash collateral pursuant to the terms of the Budget attached to Marcus' Declaration and will continue negotiating the treatment of Ventura's claims against the Debtors.

### iii.   Payment of Health Care Premiums

39.     EBF currently has seven (7) full-time employees who are entitled to health benefits.  It is essential to the continued efforts of EBF that it retains these employees to continue its on-going liquidation efforts.  Many employees live from paycheck to paycheck and rely on receiving their full benefits, including health, dental, and vision benefits, for their families' health and welfare.  Moreover, the Debtors believe that if they are not granted the relief requested, employee morale and loyalty will be jeopardized at a time when employee support is critical, and possibly waning. The Debtors believe such uncertainty will cause significant anxiety at precisely the time that the Debtors need its employees to perform their jobs at peak efficiency.

40.     The Debtors are currently part of a medical benefits programs that consists of health insurance through Western Growers Assurance Trust, dental/vision insurance through Cypress Insurance, and life insurance through MetLife (collectively, the "Medical Benefits Program").  The Medical Benefits Program is available for all of the employees of the Debtors and their families.  Not surprisingly, nearly all of the Debtors' employees subscribe to the Medical Benefits Program for their health insurance and benefits.  As of the Petition Date, the outstanding amount owed on premiums under the Medical Benefits Program was $7,425.15.  A chart of the Medical Benefits Program owed and requested to be paid is attached hereto as Exhibit iii-A.   These health benefits are critical elements to the employees' long-term relationship with the Debtors and Debtors' continued efforts to liquidate its assets and maximize recovery for the benefit of creditors.

41.     In addition to the seven (7) regular employees covered by Debtors' health care insurance, the widows of Gilfenbain and Wiviott continue to be covered through the Debtors' health insurance plan.  Mrs. Gloria Gilfenbain and Mrs. Sharon Wiviott are both in excess of 80 years' old and, through their respective husbands, have been on the Debtors' health insurance program since its inception.  The CRO has entered into discussions with Mrs. Gilfenbain and Mrs. Wiviott with respect to their health care coverage.  Rather than disrupt Mrs. Gilfenbain and Mrs. Wiviott health care coverage, at this time, Mrs. Gilfenbain and Mrs. Wiviott have agreed to reimburse the estates in full each month for any health insurance expenditures on their behalf.

The Debtors assert no party will be prejudiced by the arrangement as the estates will be fully reimbursed by Mrs. Gilfenbain and Mrs. Wiviott.

42.    The payment of the health insurance premiums is critical for the on-going efforts of EBF to liquidate its assets and these individuals' livelihood. Since September 2017, the Debtors' employee ranks have been pared down from nearly 3,000 to the CRO along with seven (7) additional employees. The Debtors' ability to continue its downsizing and liquidation efforts is premised on highly-motivated employees knowledgeable about the process undertaken by the CRO and the Debtors' creditors, business affairs, and books and records. A motivated and productive staff is required for the Debtors to complete its efforts to pay its creditors and operating expenses. The payment of the Medical Benefits Program enables the Debtors to retain its employees and is necessary for the employees to maintain critical health coverage. Each of the Debtors' employees relies on their benefits for themselves and for the families.

### iv.    Key Employee Severance and Contractual Payments

43.    As of September 6, 2017, the Debtors had nearly 3,000 employees throughout California working in the fields and offices. Since his appointment, the CRO has undertaken substantial efforts to pare down the Debtors' operations in his efforts to maximize recovery. The CRO has continued to review any remaining employees and identified a total of six (6) employees to assist with the wind down and liquidation of the Debtors' remaining assets (the "Key Employees").[6] During the prepetition wind-down period, these Key Employees continued to receive their ordinary course wages and also received their long-standing year-end incentives.

44.    These Key Employees have institutional know-how, unique experience, familiarity with the CRO and Debtors' day-to-day operations, and are critical to successfully executing the Debtors' Chapter 11 strategy. All of the Key Employees perform core functions in accessing, maintaining, and keeping the Debtors' books and records, with incalculable knowledge of the Debtors' history and records.

---

[6] As of the Petition Date, in addition to the CRO, EBF had a total of seven (7) employees; however, one of the employees has already given notice of his departure from employment with EBF. This employee, Miguel Luquin, will receive his accrued, but unpaid, vacation and time off but will not be entitled to receive a severance payment as set forth below.

### 1.    Severance Payments

45.    Four (4) of the Key Employees are "at will" employees with 50+ years combined experience working in various positions with the Debtors. The CRO undertook a confidential and thorough review of the Debtors' staffing requirements in the context of these Chapter 11 cases. The CRO identified these four (4) Key Employees as critical to the Debtors' strategy based on their level of familiarity with the Debtors' businesses, experience working with the Debtors' vendor and customer base, the extent of their role in the Debtors' operations, including the scope of services being provided to the Debtors under the current circumstances.

46.    None of these four (4) Key Employees are insiders of the Debtors within the purview of section 101(31) and 503(b) of the Bankruptcy Code. Prior to the Petition Date, the CRO designed the severance payments as part of the strategy to motivate these employees to remain employed with the Debtors while the Debtors execute the liquidation strategy and administer the Chapter 11 cases. The terms and payment details of the severance payments are attached to hereto as Exhibit iv-A. The terms for the four (4) Key Employees are summarized as follows:

a.    Total Payment. Each of the four (4) Key Employees will receive as part of their final paycheck with the Debtors a one-time severance payment consisting of (i) 13-weeks (25%) of their respective base annual salary; and (ii) all applicable employment payments due, including, without limitation any accrued and unpaid vacation and sick days (collectively, the "Severance Payments").

b.    Timing of Payments. Each of the four (4) Key Employees will receive their respective Severance Payments on their final date of employment with the Debtors. At this time, the CRO is unable to identify the exact date when such payment will be paid or whether the Key Employees will be terminated collectively or on an individual basis. However, regardless of date or procedure, none of the four (4) Key Employees will receive his/her respective Severance Payment prior to final date of employment.

///

## 2.    Contractual Severance Payments

47.    Two (2) of the Debtors' Key Employees are subject to written prepetition employment contracts entered into with the respective employee prior to the appointment of the CRO.  The Debtors' seek approval of the severance payments as set forth in the respective contracts (the "Contractual Payments") as summarized below:

a.    Rodolfo Garza ("Garza").  Garza is the Debtors' President and Chief Financial Officer.  On January 1, 2016, EBF entered into an Executive Employment Agreement with Garza for his services as President and CFO (the "RG Employment Contract").  A copy of the RG Employment Contract is attached as Exhibit iv-B to the Key Employee Severance and Contractual Payment Motion.  The term of the RG Employment Contract ends on December 31, 2018 (the "RG Term").  Section 7.02 of the RG Employment Contract, as applicable, provides Garza with severance payment consisting of: (i) his monthly salary for all remaining months of the RG Term; and (ii) all unpaid but accrued vacation and sick time.  For example, if Garza is terminated on April 30, 2018, he will be entitled to eight (8) months of his monthly salary, plus all unpaid but accrued vacation and sick time.

b.    Ashley Chavira.  Ashley Chavira is member of the Debtors' sales and marketing department.  On August 1, 2014, EBF entered into an Employment Contract with Ms. Chavira for her services (the "AC Employment Contract").  A copy of the AC Employment Contract is attached as Exhibit iv-C to the Key Employee Severance and Contractual Payment Motion.  As extended pursuant to its terms, the term of the AC Employment Contract ends on July 31, 2018.  Section 8.2 of the AC Employment Contract provides Ms. Chavira with a severance payment consisting of: (i) three (3) months of Ms. Chavira's annual base salary; and (ii) all unpaid but accrued vacation and sick time.

48.    The Severance Payments and Contractual Payments address a critical need that will assure that the Debtors' management and workforce are compensated at appropriate levels, ease the uncertainty attendant to these Chapter 11 cases and perhaps, most importantly, incentivize them to achieve optimum performance levels that will maximize value and promote

a successful Chapter 11 strategy. The Severance Payments and Contractual Payments represent a sound exercise of the Debtors' business judgment and comply with all of the provisions of the Bankruptcy Code.

### v.    PACA Claimant Procedures

49.    The Debtors believe that certain of its creditors may qualify for protection under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("PACA"). The definition of "perishable agricultural commodities" under PACA generally includes "[f]resh fruits and fresh vegetables of every kind and character [whether or not frozen or packed in ice]." 7 U.S.C § 499a(b)(4). PACA eligible produce suppliers and their agents (the "PACA Claimants") are the beneficiaries of a statutory trust (the "PACA Trust") in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets"). *See* 7 U.S.C. § 499e(c)(2). PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets, and are not property of a Debtors' estate.

50.    PACA Claimants may be eligible to assert claims under the respective statutes for outstanding payments owed by the Debtors on account of applicable merchandise (collectively, the "PACA Claims"). In particular, the Debtors estimate that, as of the Petition Date, PACA Claimants may hold approximately $200,000 in unpaid PACA Claims. Because the PACA Claimants may impose a statutory trust on certain assets in the Debtors' possession and thereby obtain priority ahead of all other secured and unsecured creditors of the Debtors' estates, the Debtors' payment of valid PACA Claims will not prejudice or affect the amount of recoveries available to other creditors.  The Debtors propose the following procedures for the review, allowance, and payment of the PACA Claims:

a.    PACA Notices.  Any PACA Claimant seeking the protection of a PACA Trust must deliver, or have previously delivered, a valid and timely PACA Notice to the Debtors in accordance with the statutory guidelines set forth in 7 U.S.C. § 499e(c)(3) or 7 U.S.C. § 499e(c)(4).

16

b.    Notice of PACA Order.  The Debtors will send a copy of the order approving this Motion (the "PACA Order") within seven (7) days of entry thereof by first-class mail, email, or third-party commercial carrier to all persons or entities that have delivered a valid and timely PACA Notice (or a document that purports to be a valid and timely PACA Notice) to the Debtors.

c.    Allowed PACA Claims.  If the Debtors determine that a claim (or a portion of a claim) asserted in a PACA Notice is valid, the Debtors shall pay such claim (or a portion thereof) as soon as practicable after receipt of the PACA Notice, or if later, in accordance with PACA Claimant's payment terms (the "Allowed PACA Claim"). Any holder of a PACA Claim that accepts payment from the Debtors on account of its Allowed PACA Claim shall be deemed to have waived, released, and discharged any and all claims, of any type, kind, or priority on account of or in connection with its PACA Claim against the (i) Debtors, (ii) any former, present, or future officer, director, or employee of the Debtors, (iii) the Debtors' assets and properties and (iv) any funds or amounts held in the PACA Trust by the Debtors, but only as to the amount of such payment.

d.    Settled Claim Report.  Sixty (60) days from entry of the final order approving the PACA Procedures, and every thirty (30) days thereafter, the Debtors shall file a report with the Court listing all Allowed PACA Claims (the "PACA Claims Report") for the preceding thirty (30) day period.  The PACA Claims Report shall be sent by first class mail, email, or third-party commercial carrier to the following parties: (i) the Office of the United States Trustee for the Central District of California, (ii) counsel for any statutory committee appointed in these chapter 11 cases, (iii) all parties filing a PACA Claim that are listed in such PACA Claims Report and (iv) counsel to the Debtors' postpetition secured lenders.

e.    Disputed Claim Report.  Sixty (60) days after entry of the PACA Order, the Debtors will file with the Court a report (the "Disputed PACA Claims Report") that lists the PACA Claims the Debtors believe are invalid in whole or in part.  The Disputed PACA Claims Report shall be sent by first-class mail to the following parties: (i) the

17

Office of the United States Trustee for the Central District of California, (ii) counsel for any statutory committee appointed in these chapter 11 cases, (iii) all parties filing a PACA Claim that are listed in such Disputed PACA Claims Report and (iv) counsel to the Debtors' Postpetition secured lender(s).

f.      <u>Objections to Disputed PACA Reports</u>. A PACA Claimant (each, an "<u>Objecting Claimant</u>") objecting to the Debtors' determination of the PACA Claim as set forth in the Disputed PACA Claims Report must provide the Debtors with evidence or documentation demonstrating the basis for the dispute, including a statement identifying which information in the Disputed PACA Claims Report is incorrect, specifying the correct information, and stating any legal or factual basis for the objection (each, a "<u>PACA Objection</u>"). Objections must be served on (i) counsel to the Debtors, (ii) counsel for any statutory committee appointed in these chapter 11 cases and (iii) counsel to the Debtors' Postpetition secured lenders, so as to be actually received no later than the 20th day following the date the Disputed PACA Claims Report is filed (the "<u>PACA Objection Deadline</u>").

g.      With respect to each PACA claim in the Disputed PACA Claims Report as to which no objection is timely received, such PACA Claim shall be deemed an invalid PACA Claim (in whole or in part, as specified in the Disputed PACA Claims Report) without further order of the Court and, to the extent invalid, shall not be entitled to the priorities provided under PACA. With respect to each PACA Claim in the Disputed PACA Claims Report as to which an objection is timely received and the parties resolve the objection, the PACA Claim shall be treated as an Allowed PACA Claim or a disallowed PACA Claim, in whole or part, as agreed to by the parties, without further order of the Court, as set forth in the next PACA Claims Report.

h.      With respect to each PACA Claim in the Disputed PACA Claims Report as to which an objection is timely received an the objection cannot be resolved by the parties, the PACA Claim shall not be deemed valid or invalid except upon order of the Court. If a resolution is not reach by at least fourteen (14) days after the date of the Disputed PACA Claims Report, or such later period as may be agreed to by the Debtors

18

and the claimant, either the Debtors or PACA Claimant may move for a hearing before the Court to resolve the objection

### vii.    Adequate Assurance of Utility Payments

51.    The Debtors have assigned or abandoned nearly all of their leases. The only remaining substantive lease is for the Debtors' office space in Los Angeles and for its Oxnard yard. All of EBF's traditional utilities for the Los Angeles office (*i.e.,* electricity, water, gas, etc.) are included in the Debtors' lease and provided through the Debtors' landlord, except for the Debtors' following telephone, internet, and cable services:

a.    Frontier Communications provides the Debtors' internet service and telephone system. The Debtors' monthly fixed cost with Frontier Communications is approximately $250.00.

b.    Time Warner Cable, now known as Spectrum, also supports the Debtors' internet and cable system. The Debtors' monthly fixed cost is approximately $435.00.

52.    The Debtors submit that, given the minimal monthly amounts owed to each of the Utility Companies, entry of an order granting the relief requested is consistent with, and fully satisfies, the requirements of section 366 of the Bankruptcy Code. The Debtors seek authority to provide the Utility Companies with more than adequate assurance of payment through the retention of any prepetition deposit, administrative expense for any unpaid postpetition expenses, and the opportunity to request additional adequate assurance of payment. When complemented by the Debtors' ability to continue to pay the Utility Companies, such assurance of payment significantly alleviates – if not eliminates – any honest concern of nonpayment on the part of the Utility Companies.

### D.    Additional Relief to Be Requested

53.    The Debtors were forced to file these cases under exigent circumstances interrupting the CRO and Debtors' continued efforts to liquidate its assets and maximize the value of the Debtors' estates. To that end, and to resume its wind-up of affairs, the Debtors anticipate that it will soon be filing additional motions and applications seeking, *inter alia*, employment of professionals, authority to sell assets, and pursue other causes of action for the benefit of the estates.

**E.    Conclusion**

54.    The Debtors require the relief requested in the First Day Motions to avoid immediate and irreparable harm to its operations, employee morale, and provide it the opportunity to orderly liquidate with the protections afforded through the Bankruptcy Code. The relief requested will assure that the downsizing and liquidation efforts will continue without interruption, notwithstanding the Debtors' chapter 11 filing.    This assurance is of utmost importance to the success of the Debtors' efforts, the retention of its staff and its ability to maximize recoveries on behalf of all parties in interest.

55.    By reason of the foregoing, I believe the relief requested in the First Day Motions is necessary, proper, and required to provide the Debtors the opportunity to orderly liquidate its assets and propose a plan to pay the Debtors' creditors on a fair and equitable basis through the mechanisms of the Bankruptcy Code.

[SIGNATURE PAGE TO FOLLOW]

1    I declare under penalty of perjury that the foregoing is true and correct to the best of my

2    knowledge, information and belief.

3

4    Dated: January 18, 2018

5

6

7    ROBERT MARCUS
     CHIEF RESTRUCTURING OFFICER
8    ECLIPSE BERRY FARMS, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
633 West 5th Street, Suite 4000, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): DECLARATION OF ROBERT MARCUS, CHIEF
RESTRUCTURING OFFICER IN SUPPORT OF FIRST DAY MOTIONS
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
01/18/18, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Ron Maroko:  ron.maroko@usdoj.gov
Kevin H. Morse:  kevin.morse@saul.com
United States Trustee (LA):  ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 01/18/18, I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class,
postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will
be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 01/18/18, I served the
following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 01/18/18 | Marion Diamond | |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

## SERVICE LIST

**BY U.S. MAIL:**

**DEBTOR:**

Eclipse Berry Farms, LLC
11812 San Vicente Boulevard, Suite 250
Los Angeles, CA  90049

Harvest Moon Strawberry Farms, LLC
11821 San Vicente Boulevard, Suite 250
Los Angeles, CA  90049

Rosalyn Farms, LLC
11821 San Vicente Boulevard, Suite 250
Los Angeles, CA  90049

**SECURED CREDITOR:**

COUNSEL TO VENTURA STRAWBERRY FARMS, LLC
Alan I. Nahmias
Mirman, Bubman & Nahmias LLP
21860 Burbank Boulevard, Suite 360
Woodland Hills, CA  91367-7406

**THE HONORABLE BARRY RUSSELL:**          **(Sent Via Messenger Hand Delivery)**
United States Bankruptcy Court
Central District of California
255 East Temple Street, Suite 1660
Los Angeles, CA  90012

*Pg. 65*

**LIST OF 20 LARGEST CREDITORS:**

Advance Plant Nutrition LLC
2888 Estates Drive
Aptos, CA  95003

AG RX, Inc.
751 South Rose Avenue
Oxnard, CA  93030

Alex Camany
18825 Heritage Court
Salinas, CA  93908

American Express
P.O. Box 0001
Los Angeles, CA  90096-8000

Armstrong Transport Group Inc.
P.O. Box 560687
Charlotte, NC  28256-0687

BNSF Logistics, LLC
2710 S. 48th Street
Springdale, AR  72762

C H Robinson Worldwide Inc.
P.O. Box 9121
Minneapolis, MN  55480-9121

Cal-Tex Transportation, LLC
P.O. Box 107
Visalia, CA  93291

Central Cold Storage
P.O. Box 742352
Los Angeles, CA  90074-2352

Coastal Growers Supply, Inc.
1450 Soloman Road
Santa Maria, CA  93455

Crop Production Services (649)
P.O. Box 657
Salinas, CA  93902

George-Pacific Corrugated LLC
Attn: P.O. Box 743348
1000 W. Temple St.
Los Angeles, CA  90012

Golden Four Express, LLC
c/o Crecia Sue Plaugher
13287 El Nogal Ave
Visalia, CA  93292

Jerue Truck Broker, Inc.
P.O. Box 33080
Lakeland, FL  33807

Robert Mann Packaging, Inc.
1051 S. Rose Avenue
Oxnard, CA  93030

TCI Business Capital, Inc.
9185 Paysphere Circle
Chicago, IL  60674

Tri Cal, Inc.
8100 Arroyo Circle
Gilroy, CA  95020

Unified Carries
1105 South M Street
Oxnard, CA  93033

Ventura Strawberry Farms, Inc.
5000 N. Parkway Calabasas
Suite 107
Calabasas, CA  91302

Cal Dept. of Food & Agriculture
Headquarters Legal Office
1220 N. Street, Fourth Floor
Sacramento, CA  95814

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA  94280-0001

Franchise Tax Board
Bankruptcy Section MS: A-340
P.O. Box 2952
Sacramento, CA  95812-2952

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA  19101-7346

Los Angeles County Tax Collector
P.O. Box 54110
Los Angeles, CA  90054-0110

Santa Barbara County Treasurer
511 Lakeside Parkway, #104
Santa Maria, CA  93455

State Board of Equalization
Special Ops Bankruptcy Team MIC 74
P.O. Box 942879
Sacramento, CA  94279-0074

Treasurer – Tax Collector of
Monterey County
P.O. Box 891
Salinas, CA  93902-0891

United States Trustee
915 Wilshire Boulevard, Suite 1850
Los Angeles, CA  90017

Frontier Communications
P.O. Box 740407
Cincinnati, OH  45274-0407

Frontier Communications
c/o Corporation Service Company
401 Merritt 7
Norwalk, CT  06851

*pg. 66*

Spectrum Business
2939 Nebraska Avenue
Santa Monica, CA  90404

Alan I. Nahmias
Mirman, Bubman & Nahmias LLP
21860 Burbank Boulevard, Suite 360
Woodland Hills, CA  91367-7406

Alliant Insurance Services, Inc.
701 B Street, 6th Floor
San Diego, CA  92101

Growers Captive Group
c/o York Risk Services Group
333 City Boulevard West, Suite 1500
Orange, CA  92868

pg. 67